**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| GLENDA CABLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-01853-TWP-DKL |
| | ) | |
| FCA US LLC, formerly known as Chrysler | ) | |
| Group LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant FCA US LLC's ("FCA") Motion for Summary Judgment (Filing No. 45).  Following several incidents of perceived racial harassment, Plaintiff, Glenda Cable ("Cable") filed this action against her employer, FCA, alleging claims of a hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981[1] ("Title VII").  FCA asserts that summary judgment is appropriate because Cable cannot establish that the alleged harassment was severe or pervasive or that there is a basis for employer liability.  For the reasons set forth below, FCA's motion is **GRANTED**.

## I.  BACKGROUND

The following material facts both undisputed and disputed, are presented in the light most favorable to Cable as the non-moving party, and all reasonable inferences are drawn in her favor. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[1] Although Cable also alleged a retaliation claim in her complaint, Cable abandoned that claim in response to summary judgment. (*See* Filing No. 50 at 1.)

FCA is a full-line vehicle manufacturer with facilities across the United States, including five plants in Kokomo, Indiana.  Cable has been employed by FCA for approximately 27 years. On October 3, 1988, she was hired by FCA at its Huntsville, Alabama plant as an assembly line worker.  In September 2009, she transferred to FCA's Kokomo, Indiana plant where she works in Department 6000 as a Production Operator.  Department 6000 builds transmissions, and is composed of both a "button up" and a "payout" section.  Cable remains employed by FCA and works in the payout section on a series of rotating assembly line jobs.

**A.**     **<u>Voodoo Doll</u>**

On February 25, 2013, Cable observed that a co-worker, Scott Eltzroth ("Eltzroth"), had a small black doll hanging from his belt by a string which was around the dolls neck.  At the time, Eltzroth was the Team Leader of Cable's team.  However, Eltzroth was not considered a management employee because Team Leaders did not have the authority to hire, fire, promote, demote, or discipline employees.

Cable told Eltzroth that the doll offended her.  In response, Eltzroth explained that it was a voodoo doll, and he began poking the doll with needles.  Because she was offended, Cable asked Mary Hammond ("Hammond"), a supervisor for Department 6000, to contact Labor Relations Supervisor, Lawrence Wilson ("Wilson").  When Cable requested that Hammond and Wilson come to the plant floor, Eltzroth walked away ranting, raving and cursing—he stated that the doll was for his personal protection and Cable could not make him take it off.

Both Hammond and Wilson spoke with Eltzroth about the doll that same day, and Wilson told Eltzroth not to wear the doll or have it out at work again.  Eltzroth agreed not to bring the doll to work again but he continued to show the doll to other co-workers that afternoon.

Prior to this incident, Cable's working relationship with Eltzroth was "fine" and she had never heard Eltzroth make any racial remarks.  After reporting her complaint to Wilson, Cable never saw the doll again.

**B.**     **"NIG" Etching**

Less than two months later, on April 2, 2013, after returning from vacation, Cable noticed the letters "NIG" etched into a control box at her work station in the payout area in Department 6000.  Cable was the only African-American member of Team 1 (which has seven members) in Department 6000, the area where the etchings were discovered.  Cable notified Phil McBee ("McBee"), a supervisor in Department 6000, and McBee told Cable that he would have maintenance remove the letters before the next shift.  Cable also showed Hammond the etching.

Thereafter, McBee contacted the maintenance supervisor to have the letters removed.  In addition, Hammond sent an email to Wilson to report the incident.  However, Wilson did not receive the email until the next morning, as he was not on-site on the day the etching was discovered.

The next day, Cable noticed that the letters were still etched into the control panel.  Cable requested that her supervisor, Patricia Rent ("Rent"), contact Wilson.  Shortly thereafter, Wilson came to the area to speak with Cable.  In addition, Wilson spoke with Hammond and Rent in an attempt to determine who wrote the letters.  However, neither supervisor was able to determine who had made the etching.

Wilson also asked Hammond why the etching had not been removed overnight.  Hammond responded that a request was made to maintenance the day before, and that a second request had also been made.  Later that morning, maintenance arrived and grinded or sanded the letters off the control panel.  Nevertheless, Cable could still see a "shadow" of the letters after they had been

3

grinded off.  However, to see the "shadow" of the letters, one must step back and look at the control panel from a certain angle, and Cable noted that the "shadow" was not visible under the lights of the facility.   Even so, Cable did not complain to any management employee that the letters were still visible to her at certain angles.

Cable does not know who made the etching, but she does not believe that Eltzroth etched the letters onto the machine.

**C.**     **"N" Etching**

Six months later, on October 8, 2013, Cable noticed that the letter "N" had been scratched on the same control panel as the previous etching.  Cable complained to her supervisor, Douglas Trent.  Thereafter, the Area Manager Brett Gray, Hammond, and Wilson came to the area to talk with Cable.  Cable was so upset by the second etching that she left before her scheduled shift ended.

Wilson immediately contacted a Millwright and a Painter who buffed and painted the entire panel.   In addition, Wilson interviewed all of the team members who had access to that workstation, and inquired as to whether any knew who might have made the etching.  In total, Wilson interviewed twelve employees.  None of the employees admitted any knowledge of who had made the etching.  In addition, over the next two days, supervisors held discrimination and harassment talks with all team members in Department 6000.  During these talks, all team members were read FCA's policy prohibiting discrimination and harassment, and copies of the policy were made available.

Following this incident, Cable took a three-month medical leave of absence.  During her leave, she was diagnosed with anxiety and depression due to work-place stress, and she underwent

frequent counseling.  Cable does not know who made the second etching, but she does not believe that Eltzroth created it.

**D.**   **"Red Eye" Drawing**

On January 7, 2014, her first day back from medical leave, Cable complained about a drawing of a face that she observed on a guardrail.  The drawing had the words "Red Eye" over it.  Cable understood the term "Red Eye" to refer to African-Americans.  In addition, she believes that the drawing was meant to depict her, as it had a small spot on the side of the face, in the same place where Cable frequently wears a band-aid.  Cable complained about the drawing to Wilson, and Wilson had the drawing painted over that same day.  Neither Wilson nor Cable knows who made the drawing.

**E.**   **Additional Etching**

On May 1, 2014, Cable complained to a supervisor about another etching on a different machine, and Wilson immediately reported to the area.  Cable believed that the etching depicted either the letters NIG or the word "bitch".  Wilson viewed the etching and he did not believe it spelled anything and, instead, believed that the etching was likely made by a torque gun.  Nevertheless, Wilson immediately had tape put over the etching and had the machine sanded and painted the same day.  Cable does not know who made the etching.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court reviews the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Zerante*, 555 F.3d at 584; *Anderson*, 477 U.S. at 255.

The party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323 (noting that, when the non-movant has the burden of proof on a substantive issue, specific forms of evidence are not required to negate an non-movant's claims in the movant's summary judgment motion, and that a court may, instead, grant such a motion, "so long as whatever is before the district court demonstrates that the standard . . . is satisfied."). *See also* Fed. R. Civ. P. 56(c)(1)(A) (noting additional forms of evidence used in support or defense of a summary judgment motion, including: "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials").

Thereafter, a non-moving party, who bears the burden of proof on a substantive issue, may not rest on its pleadings but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. *Hemsworth*, 476 F.3d at 490; *Celotex Corp.*, 477 U.S. at 323-24; Fed. R. Civ. P. 56(c)(1).  Neither the mere existence of some alleged factual dispute between the parties nor the existence of some "metaphysical doubt" as to the material facts is sufficient to defeat a motion for summary judgment. *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997); *Anderson*, 477 U.S. at 247-48; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [it] relies." *Harney*, 526 F.3d at 1104.

Similarly, a court is not permitted to conduct a paper trial on the merits of a claim and may not use summary judgment as a vehicle for resolving factual disputes. *Ritchie v. Glidden Co., ICI Paints World-Grp.*, 242 F.3d 713, 723 (7th Cir. 2001); *Waldridge*, 24 F.3d at 920. Indeed, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("these are jobs for a factfinder"); *Hemsworth*, 476 F.3d at 490. Instead, when ruling on a summary judgment motion, a court's responsibility is to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Id.*

## III. <u>DISCUSSION</u>

Cable argues that she was subject to a hostile work environment because of her race. Her claims arising under Section 1981, use the same legal standards for liability as Title VII. *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004); *Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 637 n.1 (7th Cir. 2001); *Miller v. Ind. Univ. Health, Inc.*, No. 1:12-CV-1667-TWP, 2014 WL 4259628, at *4 (S.D. Ind. Aug. 29, 2014) (J. Pratt).

Title VII is violated when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment". *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and punctuation omitted); *Velez v. City of Chi.*, 442 F.3d 1043, 1047 (7th Cir. 2006) ("[a]n employer is prohibited from requiring employees to work in a discriminatory hostile or abusive environment"). At the same time, not all workplace unpleasantries give rise to liability under federal civil rights laws, which do not guarantee a perfect work environment. *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994). Instead, to create a hostile work environment, the conduct at issue must "have the purpose or effect of

unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).

To survive summary judgment on a hostile work environment claim, the plaintiff must put forth sufficient evidence to show that: (1) the work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on a protected characteristic; (3) the conduct was either severe or pervasive; and (4) there is a basis for holding the employer liable for the harassment. *Dear v. Shinseki*, 578 F.3d 605, 611 (7th Cir. 2009); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). An objectively hostile environment is an environment which a reasonable person would find to be hostile or abusive. *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21 (1993). In determine whether a plaintiff meets this standard, courts consider all the circumstances, including the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or a mere offensive utterance, and whether it reasonably interferes with the employee's work performance. *Id.* at 23. However, "[o]ffhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Id.* (citing *Adusumilli v. City of Chi.*, 164 F.3d 353, 361-62 (7th Cir. 1998)).

## A.  <u>Subjectively and Objectively Offensive</u>

To support a hostile work environment claim, Cable must first establish that her work environment was both objectively and subjectively offensive. Cable does not have to establish that the "complained-of conduct was explicitly racial, but must show that it had a racial character or purpose." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).

As to the subjective requirement, all Cable has to establish is that she perceived the environment to be hostile or abusive.  *See Haugerud v. Amery Sch. Dist*., 259 F.3d 678, 695 (7th Cir. 2001).  Here, Cable complained about discrimination to management and felt compelled to take a medical leave of absence and seek counseling for the perceived racial harassment.  FCA does not dispute that a reasonable jury could conclude that Cable subjectively perceived her work environment to be hostile.

FCA argues that Cable has submitted only subjective evidence that her work environment was hostile.  It asserts that Cable cannot establish that Eltzroth's display of the voodoo doll was intentionally racial.  FCA relies upon Eltzroth's explanation that the purpose of his doll was for personal protection, which is consistent with the ordinary understanding of a voodoo doll. FCA also notes that Cable never heard Eltzroth make any racial remark.

Cable, on the other hand, asserts that at least two of the characteristics of the black voodoo doll were objectively offensive:  the black colored skin of the doll and the string around its neck. Cable argues that the doll "hints of lynchings that have sadly occurred throughout American history" and "the voodoo doll … starkly reminds everyone, but especially African-Americans, of a symbol of evil."  (Filing No. 50 at 9.)

Cable asserts that the relationship of the etched letters to race is even clearer.  She explains that the three letters (NIG) or the one (N), are obviously references to the racial slur "nigger" and that "use of that slur is race related by definition, and is offensive per se".  (Filing No. 50 at 10.) To the contrary, FCA points out the no actual racial slur was etched, and asserts that the meaning of the letters is ambiguous.

With respect to the drawing of the face with the word "red eye" written on top, FCA argues that Cable has failed to demonstrate that the drawing had a racial character or purpose.  Although,

Cable believed that the term "red eye" was a reference to race, she has submitted no objective evidence to substantiate her subjective belief.  In contrast, Wilson, who is also an African-American, attests that he has never heard the term associated with African-Americans, and Cable has failed to submit any objective evidence to the contrary.[2]  (*See, e.g.*, Filing No. 51-1 at 39-44) ("I don't know why it says red eye and I don't even know why that's even there.  I don't know why they put red eye.".)

FCA additionally asserts that Cable has submitted only subjective evidence to establish that the etching she discovered in May 2014 which she believed could have spelled out either the letters "NIG" or the word "bitch" had a racial character or purpose.  In contrast, Wilson believed that it was the accidental result of a torque gun and did not spell anything.  As such, FCA contends that Cable relies solely on her subjective beliefs regarding the intentions behind her co-workers' actions; assumptions that are insufficient to create a genuine issue of material fact.  *See Mills v. First Fed. Sav. & Loan Assoc. of Belvidere*, 83 F.3d 833, 841-42 (7th Cir. 1996) ("subjective beliefs of the plaintiff are insufficient to create a genuine issue of material fact") (internal punctuation omitted); *Nichols v. Mich. City Plant Planning Dept.*, 755 F.3d 594, 602 (7th Cir. 2014) (holding that a reasonable juror could not conclude that the use of the word "boy" was uttered because of racial animus because the plaintiff did not provide evidence or context showing that it was made in a discriminatory manner); *Yancick*, 653 F.3d at 544-45 (finding that the plaintiff's allegation that his harasser "raised his fist as a black power symbol" was insufficient to establish a hostile work environment because there was "a lack of support showing that [the harasser's] gesture was meant as a racial attack").

---

[2] Further, the Court has researched the term "red eye" on both the urban dictionary (urbandictionary.com) and the website, the racial slur database (racialslurs.com), and neither associate the term "red eye" as a racial slur relating to African-Americans.

With respect to the "red rye" drawing and the perceived etching of the word "bitch", the Court agrees that Cable has not presented any objective evidence to establish an intentional racial purpose.   However, Cable has presented objective evidence to establish an intentional racial purpose based on the incidents with the voodoo doll and the etchings of NIG and N.  Applying a reasonable person standard to the question of whether the black voodoo doll with what appears to be a noose around the neck, as well as the graffiti, these three incidents could be perceived as having a racial connotation.  Although no actual racial slurs were made in any of these incidents, the Court agrees with Cable that the letters NIG and N could be objectively perceived as having a racial character or purpose relating to the word "n****r".  Moreover, "given American history, [the Seventh Circuit] recognize[s] that the word 'nigger' can have a highly disturbing impact on the listener."  *Hrobowski v. Worthington Steel Co., 358 F.3d 473, 477 (7th Cir. 2004)*; see also *Bailey v. Binyon*, 583 F. Supp. 923, 927 (N.D. Ill. 1984) (recognizing that "use of the word 'nigger' automatically separates the person addressed from every non-black person").  As such, three of the offensively race related incidents described could lead a reasonable jury to conclude that Cable was exposed to an objectively hostile work environment.  Thus, Cable has established the first prong of her hostile work environment claim.

**B.**     **Protected Characteristic**

As referenced above, at least three of the incidents could be considered racially offensive conduct by a reasonable jury.  Thus, the second prong of Cable's hostile work environment claim is also satisfied.

## C.   **Severe or Pervasive**

Having established that some of the incidents identified by Cable had an intentional racial purpose, Cable must next demonstrate that the actions were objectively severe or pervasive.[3]  In determining whether harassing conduct was severe or pervasive, "[t]he key inquiry is whether the conduct was so severe or pervasive that it altered the conditions of the employment relationship." *Nichols*, 755 F.3d at 601.   In this regard, courts look to the "totality of the circumstances", including:  (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it was physically threatening or humiliating conduct as opposed to mere verbal abuse; (4) whether it unreasonably interfered with the employee's work performance; and (5) whether it was directed at the employee.  *Id.  See also Yancick*, 653 F.3d at 544 ("[w]e will not find a hostile work environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating.").

Importantly, the harassing conduct does not need to be *both* severe and pervasive.  *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir.2007).  One instance of conduct that is sufficiently severe may be enough.  *Haugerud v. Amery Sch. Dist.,* 259 F.3d 678 (7th Cir.2001).  Conversely, separate incidents that are not individually severe may trigger liability because they frequently occur.  *Jackson,* 474 F.3d at 499.  The key inquiry is whether the conduct was so severe or pervasive that it altered the conditions of the employment relationship. *Id.*

To begin, the harassing incidents did not occur frequently.  "Relatively isolated" instances of non-severe misconduct will not support a hostile work environment claim.  *See, e.g.*, *Weiss v.*

---

[3] Cable has put forth sufficient evidence to establish *subjective* severity and pervasiveness, having demonstrated that she felt compelled to take a medical leave of absence and seek counseling for the perceived racial harassment. However, Cable is also required to show that the allegedly offensive conduct was *objectively* severe or pervasive.

*Coca–Cola Bottling Co. of Chi.*, 990 F.2d 333, 337 (7th Cir. 1993). In total, Cable complains of five incidents, some of which are relatively ambiguous, occurring across fourteen months. Based on the character of the incidents, this is not objectively frequent. *See Nichols*, 755 F.3d at 601 ("while there is no magic number of slurs that indicates a hostile work environment, an *unambiguous* racial epithet falls on the more severe of the spectrum") (emphasis added and internal punctuation omitted).

In addition, none of the incidents of alleged racial harassment were particularly severe. While offensive, Cable has neither alleged nor submitted any evidence to suggest that the doll, the etchings, or the drawing were physically threatening. *See Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841-42 (7th Cir. 2009) ("[o]ffhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment"); *McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 625-26 (7th Cir. 2004) (holding that the "unfriendly", non-threatening, behavior of a co-worker was insufficient to establish a hostile work environment).

Similarly, the impact of viewing the letters NIG and N is less severe than an employee who actually hears or sees the word 'n****r' multiple times or is exposed to overt racist graffiti in the workplace. *See Cerros*, 398 F.3d at 950 ("an unambiguously racial epithet falls on the 'more severe' end of the spectrum"); *See Nichols*, 755 F.3d at 601 ("one utterance of the n-word has not generally been held to be severe enough to rise to the level of establishing liability").

Furthermore, FCA argues that Cable has not submitted evidence to suggest that the conduct was specifically directed at her. They note that Eltzroth explained that his voodoo doll was for protection and there is no evidence that its display was directed specifically at Cable. Additionally, Cable admits that she rotates through several workstations throughout the day, sharing workspaces with her co-workers. As a result, the area where the first two etchings were discovered was not

13

exclusively Cable's workstation.  Although Cable is the only African-American on her team, she did not submit evidence to show that she was the only African-American that worked in Department 6000.  Finally, neither FCA nor Cable knows who made the etchings or the drawing, nor does anyone know why they were made.  *See Yancick*, 653 F.3d at 545 ("the more remote or indirect the act claimed to create the hostile working environment, the more attenuated the inference that it had an effect on the terms and conditions of the plaintiff's workplace.").

As a result, Cable has not established that the conduct was specifically directed at her.  *See, e.g.*, *Nichols*, 755 F.3d at 602 (concluding that the plaintiff employee did not establish a hostile work environment, in part, because a reasonable trier of fact could not conclude that the alleged incidents were directed at the plaintiff); *Yuknis v. First Student, Inc.*, 481 F.3d 552, 555 (7th Cir. 2007) ("[t]he more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that the worker's working environment was actually made unbearable"); *Eversole v. Spurlino Materials of Indianapolis, LLC*, 804 F. Supp. 2d 922, 935-36 (S.D. Ind. 2011) (granting the defendant employer's motion for summary judgment because plaintiff failed to establish that any of the racist comments were made directly to the plaintiff).

Because the conduct alleged was neither severe nor pervasive, Cable cannot establish this third prong of a hostile work environment claim.

## D.   <u>Supervisor Liability</u>

Even if the Court were to find that the complained of conduct was objectively severe and pervasive, Cable cannot establish a basis for employer liability.  The standard of liability hinges on whether the harasser was the plaintiff's supervisor.  *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004).

Cable has not presented any evidence that a supervisor was involved in any of the five incidents of alleged harassment.  Although Eltzroth was a "Team Leader" at the time of the doll incident, Cable has not rebutted the fact that Team Leaders did not have the authority to hire, fire, demote, promote, or discipline employees.  (Filing No. 46-3 at 3.)  Nor has Cable argued that Team Leaders were supervisors for purposes of vicarious liability for employee harassment.  *See also Vance v. Ball State Univ.*, 133 S. Ct. 1434, 2454 (2013) ("[w]e hold that an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim"); *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998) (stating that the authority of a supervisor primarily consists of the power "to hire, fire, demote, promote, transfer, or discipline an employee").

As such, because the alleged harassment was perpetrated by a co-worker, rather than a supervisor, Cable must proceed under a negligence theory and present "competent evidence that her employer was negligent either in discovering or remedying the harassment directed at her." *Phelan v. Cook Cnty.*, 463 F.3d 773, 784 (7th Cir. 2006) (internal citations omitted); *Vance v. Ball State Univ.*, 646 F.3d 461, 471 (7th Cir. 2011).  In this regard, once the employer is made aware of the harassing conduct, "the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring."  *Vance*, 646 F.3d at 471; *see also Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) ("[o]ur focus, therefore, is on whether [the employer] responded promptly and effectively to the incident").

"Title VII does not require that an employer's responses to a plaintiff's complaints successfully prevent subsequent harassment".  *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 954 (7th Cir. 2005) (internal punctuation omitted).  Instead, the employer's response must be "reasonably

calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made." *Id.*; *see also Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001). For example, the employer can avoid liability if it "promptly investigate[s] each complaint" and "calibrat[es] its response to the results of the investigation and the severity of the conduct." *Vance*, 646 F.3d at 473. Further, whether an employer's response to an employee's claim of harassment is reasonable is analyzed "in light of the circumstances of the case at the time the allegations are made". *Longstreet v. Ill. Dep't of Corrs.*, 276 F.3d 379, 382 (7th Cir. 2002); *see also Vance*, 646 F.3d at 472-73.

FCA's responses to Cable's complaints regarding racial harassment were timely and reasonably likely to prevent the harassment from recurring. In response to each alleged incident of harassment, FCA took immediate action to remedy the offending conduct, either by instructing Eltzroth that he was not allowed to bring his voodoo doll to work or by removing the anonymous etchings and drawing within 24 hours of Cable's complaints. In addition, Wilson investigated two of the etchings, interviewing Cable's supervisors and twelve of Cable's co-workers. Further, when the investigations proved unfruitful in discovering the perpetrators of the offending etchings, FCA's supervisors engaged in timely training for all Department 6000 employees explaining the company's policies against racial harassment. *See Vance*, 646 F.3d at 473 (noting that a defendant employer can avoid liability if it "promptly investigate[s] each complaint" and "calibrat[es] its response to the results of the investigation and the severity of the conduct").

Although FCA was unable to ultimately determine who had made the etchings or prevent their reoccurrence, that is not the standard of liability. *See Cerros*, 398 F.3d at 954. Cable was required to demonstrate that FCA failed to take reasonable steps to discover or rectify the alleged harassment. *Id.*; *see also Berry*, 260 F.3d at 811. This she did not do.

16

Accordingly, because Cable cannot demonstrate all of the necessary elements to support her hostile work environment claim, and because she has abandoned her retaliation claim, summary judgment in FCA's favor is warranted.

## IV.  **CONCLUSION**

For the aforementioned reasons, the Court **GRANTS** FCA's Motion for Summary Judgment (Filing No. 45).  Final judgment by separate order.

**SO ORDERED.**

Date: 4/28/2016

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Melissa K. Taft
JACKSON LEWIS P.C. - Indianapolis
melissa.taft@jacksonlewis.com

Michael W. Padgett
JACKSON LEWIS P.C. - Indianapolis
padgettm@jacksonlewis.com

Steven Sams
STEVEN SAMS, P.C.
stevensamslaw@att.net